```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
COREY ARTHUR,                            :
                        Petitioner,      :
                                         :     06 Civ. 326 (DLC)
        -v-                              :
                                         :     OPINION & ORDER
GLENN S. GOORD, COMMISSIONER, N.Y.S.     :
DEPARTMENT OF CORRECTIONAL SERVICES,     :
                        Respondent.      :
                                         :
-----------------------------------------X
```

Appearances:

Pro se Petitioner:
Corey Arthur
No. 98-A-7146
Attica Correctional Facility
P.O. Box 149
Attica, New York 14011-0149

For Respondent:
Sandra E. Cavazos
Assistant District Attorney
One Hogan Place
New York, New York 10013

DENISE COTE, District Judge:

Corey Arthur ("Arthur") brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254, following his 1998 conviction in the Supreme Court of New York, New York County for second degree murder and first degree robbery of high school teacher Jonathan Levin. On December 16, 2007, Magistrate Judge Theodore H. Katz issued a report (the "Report") recommending that the petition be denied. Arthur has objected to the Report.

For the following reasons, the Report is adopted, and the petition is denied.

BACKGROUND

As described in detail in the Report, Levin's body was found on June 2, 1997. Investigators discovered that a man later identified as Montoun Hart had used Levin's ATM card on May 30 to withdraw $800 from Levin's bank account. Under police questioning, Hart stated that he and Arthur had robbed Levin, and that Levin was killed in the course of the robbery.

Police determined that Arthur was staying at 10 Lewis Avenue in Brooklyn; they arrived at that address at approximately 1:00 p.m. on June 7. Police knocked on the apartment door and Detective Garcia, who testified at trial that he knew Arthur from the neighborhood, told Arthur through the door, "It's Garcia. I am not leaving, come on out." As soon as Arthur opened the door and stepped barefoot into the hallway, he was placed under arrest and handcuffed.[1] He was brought back into the apartment to retrieve his shoes, at which time he said, "I know what you guys are here for. I was going to turn myself in."

Arthur was then brought to the 81st Precinct in Brooklyn and questioned by the police. He was given his Miranda

---

[1] Arthur does not contend that the police lacked probable cause to arrest him.

2

warnings, and waived his right to have counsel present.  Later in the afternoon, after learning that Hart had implicated Arthur in Levin's murder, Arthur requested counsel and the police ceased questioning.  At approximately midnight, Arthur was escorted to a police car outside the 81st Precinct in order to be transported to the 20th Precinct in Manhattan.  As Arthur approached the police car, a crowd of spectators and news reporters that had gathered outside the station surrounded the police car.  Arthur was assisted into the vehicle and was heard by one of the officers saying softly to himself, "Damn, I didn't want to be famous like this.  I just wanted to make some money."

Arthur was indicted by a grand jury and scheduled for trial.  Prior to trial, Arthur sought to suppress, among other things, the statements he made to police upon his arrest at 10 Lewis Avenue and the statements he made in the police car en route to the 20th Precinct in Manhattan.  Arthur contended that the post-arrest statement was obtained in violation of the Supreme Court's decision in Payton v. New York, 445 U.S. 573 (1980), which held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."  Id. at 576 (citation omitted).  Arthur claimed that he was entitled to Payton protection because he was an overnight guest at 10 Lewis Avenue.  See Minnesota v. Olson, 495 U.S. 91, 98-99

3

(1990). Further, Arthur contended that the statements made in the police car were coerced because the "perp walk" from the police station to the car was the "functional equivalent of interrogation." The trial court held a suppression hearing on January 23, 1998, and again considered suppression issues on multiple days in June and September 1998.[2] The court denied Arthur's suppression motions in oral rulings on September 16 and October 6, 1998.

Trial began on October 8. As described in the Report, the evidence at trial established the following: On the day Levin was killed, Arthur arrived at his aunt's house with a four-to-five-inch laceration on his right hand; upon consensual search of Arthur's aunt's home, police recovered Arthur's boots and clothing, which had Levin's blood on them; Arthur's blood was found at the murder scene and on the bloody knife found there; Arthur's fingerprint was found on duct tape used to bind Levin; Arthur's DNA was on a cigarette found at the murder scene;

---

[2] The suppression hearing was held to address "all issues raised by the parties, including defendant's standing to challenge the police entry into both premises [i.e., 10 Lewis Avenue and Arthur's aunt's home]." Following the hearing, Arthur sought to introduce additional evidence concerning his standing to advance a Payton claim. Defense counsel asked the court to permit Arthur to testify on the limited issue of whether he was an overnight guest at 10 Lewis Avenue. The trial court declined to reopen the hearing, deeming the failure to put Arthur on the stand at the hearing a "strategy choice," and noting that the court only reopened a hearing when faced with "an inexperienced lawyer who inadvertently overlooked something, [which was] not the case here."

4

Arthur's girlfriend testified that Arthur had confessed to killing Levin; and Arthur left a message on Levin's answering machine, urging Levin to pick up the telephone, shortly before Levin was killed. On November 10, the jury convicted Arthur of felony murder as an accomplice and two counts of robbery. He was acquitted of two murder counts charging him as a principal. Arthur was sentenced to an aggregate term of twenty-five years to life in prison.

After sentencing, the trial court issued a lengthy written opinion explaining in greater detail its oral pretrial rulings on Arthur's suppression motions. The court explained that Arthur had failed to establish standing to raise a <u>Payton</u> claim with respect to his post-arrest statements because he had not shown that he had a reasonable expectation of privacy in the apartment outside of which he was arrested. In the alternative, the court ruled that no <u>Payton</u> violation occurred because Arthur was arrested in the hallway, and not in the apartment. The court further found that Arthur had not been coerced or forcibly removed into the hallway by police. As to Arthur's "perp walk" statements, the court ruled that "[t]here was no evidence even tending to prove that any of the . . . statements made by [Arthur] were coerced by the detectives or elicited in violation of [Arthur's] constitutional rights."

On direct appeal, Arthur pressed his Payton and "perp walk" claims, and also contended that the trial court violated his constitutional right to present a defense by precluding his counsel from cross-examining the police officers who testified at trial, ostensibly in order to elicit the fact that they did not search Hart's car or home for the gun used to kill Levin. The Appellate Division rejected Arthur's arguments and affirmed his conviction. See People v. Arthur, 738 N.Y.S.2d 15 (App. Div. 1st Dep't 2002). The New York Court of Appeals denied Arthur leave to appeal on March 26, 2002.

In the instant habeas petition, commenced January 9, 2006,[3] Arthur repeats the three arguments he made before the Appellate Division. First, he contends that the statements made upon his arrest at 10 Lewis Avenue should have been suppressed because his arrest was illegal under Payton and People v. Harris, 77 N.Y.2d 434 (1991). Second, he argues that the statement he made in the police car en route to the 20th Precinct in Manhattan should have been suppressed because of the coercive effect of the "perp walk." Third, he argues that his Sixth Amendment rights were violated by the trial court's preclusion of

---

[3] As the Report noted, the petition was filed more than seven years after Arthur's conviction in the trial court. Because respondent did not argue that the petition was untimely, the Report assumed that it was timely filed and reached the merits. This Court will take the same tack.

6

questioning about the police's failure to search Hart's house and car.

DISCUSSION

The Report recommended rejection of each of the three arguments raised by the petition. A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The court must make a de novo determination of the portions of the report to which petitioner objects. 28 U.S.C. § 636(b)(1); see United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." Figueroa v. Riverbay Corp., No. 06 Civ. 5364(PAC), 2006 WL 3804581, at *1 (S.D.N.Y. Dec. 22, 2006) (citation omitted).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, modified the standard under which federal courts review Section 2254 petitions. Habeas relief may not be granted unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1),(d)(2).

I. Payton Claim

The Report recommended dismissal of Athur's Payton claim on two grounds.[4] First, the Report found that habeas relief was precluded on this claim under Stone v. Powell, 428 U.S. 465 (1976), which instructs that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494. Observing that Arthur "fully availed himself of his opportunities to challenge the alleged violation in the New York courts," and that there was no "unconscionable breakdown" in the trial court's process for addressing this claim, the Report concluded that the claim was barred under Stone. Indeed, the trial court held more than five days of hearings on, among other things, Arthur's Payton claim. Second, and in the alternative, the Report dismissed Arthur's Payton claim on the merits, finding that Arthur was arrested in the hallway outside of the apartment at 10 Lewis Avenue, an area for which no warrant is

---

[4] The Court need not consider Arthur's argument that these statements should have been suppressed under People v. Harris, 77 N.Y.2d 434 (1991), because habeas relief does not lie for mere misinterpretation or misapplication of state law. See Estelle v. McGuire, 502 U.S. 62, 67 (1991).

8

required, and that the police did not coerce him out of the apartment and into the hallway. The Report's analysis is correct.

In reviewing the Payton claim on the merits, the Report observed the following:

> This claim also suffers from the insurmountable obstacle that there is no Supreme Court precedent on the subject of coerced exits from a residence, in the context of a claimed Payton violation. In light of the Supreme Court's recent instruction in Carey[ v. Musladin, 594 U.S. --, 127 S.Ct. 649 (2006)], and Carey's Second Circuit progeny, which hold that Supreme Court decisions must be construed narrowly for purposes of determining whether there has been an unreasonable application of them, the absence of any Supreme Court cases on this specific issue is fatal to Petitioner's claim.

It is to this reasoning that Arthur objects.[5] Arthur first argues that the Report "implies that the Court cannot recognize decisions rendered by the United States Court of Appeals for the Second Circuit," and therefore "recommends dismissal of the petition without considering any of the U.S. Court of Appeals cases cited that involve similar factual patterns."

Arthur's objection fails because AEDPA specifically limits federal habeas relief to cases where state court decisions have been "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

---

[5] Arthur's objections are phrased generally, and are not directed at any particular part of the Report. But given the nature of the objections, it is clear that Arthur challenges this line of the Report's reasoning.

9

Court of the United States." 28 U.S.C. §§ 2254(d)(1) (emphasis added). Indeed, as the Report explains at some length, the Supreme Court has "admonishe[d] courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions." Rodriguez v. Miller, 499 F.3d 136, 140 (2d Cir. 2007). Because by statute and Supreme Court doctrine, a federal habeas court can only rely on decisions of the Supreme Court, Arthur's objection is overruled.

Along the same lines, Arthur contends that "District Courts should, at the very least, look to Circuit Court decisions for significant insight on what constitutes reasonableness for a particular fact pattern." In support of this proposition, Arthur relies on cases from the First, Third, and Ninth Circuits, but does not cite to any Second Circuit precedent. But even were this the law in the Second Circuit, his argument would be entirely unavailing. With regard to his Payton claim, Arthur cites only one Second Circuit case, United States v. Gori, 230 F.3d 44 (2d Cir. 2000). Gori does not assist Arthur. It rejected the claim that a warrant was required when the defendant opens the door to an apartment in response to a knock and the police command the defendant to step into the hallway. Id. at 47, 54. It distinguished instances in which the door was

opened in response to a threat of force, id. at 54, which Arthur did not show occurred here.

Arthur's second objection is a bit difficult to understand. He objects "on the basis that The Second Circuit Court of Appeals has clear authority to reverse a decision of a District Court based on its own determination of whether a State court reasonably applied Supreme Court precedent." This objection is irrelevant at present, because it concerns the ability of the Court of Appeals to review a district court's ruling on a petition for habeas.[6]

Finally, Arthur contends that "the Supreme Court has already held that the failure to extend Supreme Court precedent to a new area can constitute an unreasonable application of federal law." He relies on Williams v. Taylor, 529 U.S. 362 (2000), for this objection. Williams contains no holding to this effect. Indeed, Williams explains that "[t]oday's case does not require us to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)." Id. at

---

[6] Regardless, the case Arthur cites in support of this objection, Brown v. Keane, 355 F.3d 82 (2d Cir. 2004), makes clear that the Report was correct in its AEDPA analysis. In Brown, the Second Circuit vacated and remanded the district court's denial of a state prisoner's habeas petition because it deemed the state court's admission of certain evidence a violation of the Sixth Amendment. But in doing so, the Court wrote that the state court ruling "was incompatible with the Sixth Amendment right of confrontation as it has been expounded by the Supreme Court." Id. at 91 (emphasis added).

11

408-09. In any event, any suggestion in Williams that a federal habeas court could extend Supreme Court precedent to a new area of law would be superseded by the Supreme Court's later pronouncements to the contrary. See Carey, 127 S.Ct. at 649; Rodriguez, 499 F.3d at 140.

Arthur's objections to the Report's legal reasoning are unavailing. Finding no error in the Report's treatment of Arthur's Payton claim, the claim is dismissed.

II. "Perp Walk" Claim

The Report recommended dismissal of Arthur's "perp walk" claim essentially because Arthur failed to demonstrate that the "perp walk" was the "functional equivalent of interrogation." According to the Report, Arthur failed to controvert evidence presented to the trial court that the detectives "scrupulously honored [Arthur's] right to counsel once he invoked it," and that walking him to the police car in the presence of the media was neither staged by the police in an effort to elicit inculpatory statements from him, nor the cause of his spontaneous statement in the police car. These factors, the Report found, tended to show that the perp walk did not present circumstances which "the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Relying on the Supreme Court's decisions in Brewer v. Williams, 430 U.S. 387,

12

405-06 (1977), and Colorado v. Connelly, 479 U.S. 157, 164-65 (1986), the Report found that the "perp walk" was not the "functional equivalent of interrogation," and that Arthur's spontaneous statements, which were not the product of custodial interrogation, were not subject to suppression. This analysis is correct.

In discussing this claim, the Report observed that Arthur "has not identified any Supreme Court precedent which concludes that a 'perp-walk' is the functional equivalent of an interrogation." In light of Carey, the Report found that

> the absence of precedent squarely on point dooms Petitioner's claim, because he cannot demonstrate that the state court's determination that the 'perp walk' did not effectively elicit incriminating statements improperly, was an unreasonable application of clearly established Supreme Court law.

Arthur makes no particularized objection to the Report's findings on his "perp walk" claim, but given the foregoing analysis, it is clear that his general objections apply with equal force to this claim. For the reasons discussed above, his objections fail.

With respect to Arthur's argument that the Report failed to consider Second Circuit law discussing similar fact patterns, Arthur cites only one Second Circuit case in connection with his "perp walk" claim. In Lauro v. Charles, 219 F.3d 202 (2d Cir. 2000), the Second Circuit ruled that a "perp walk" staged solely

13

for the purpose of humiliating the suspect constituted a violation of the Fourth Amendment in the context of a claim under 42 U.S.C. § 1983.[7] Lauro stressed "the limitations of our holding," id. at 213, and expressly "d[id] not address the case -- seemingly much more common than the kind of staged perp walk that occurred here -- where a suspect is photographed in the normal course of being moved from one place to another by the police," id. Arthur's "perp walk" falls into this more common category of "perp walks." Thus, even if the Report were obligated to consider similar fact patterns reflected in opinions of the Court of Appeals to discern the contours of clearly established federal law, Lauro would offer no support to Arthur's claim. Finding no error in the Report's treatment of this claim, it is dismissed.

III. Sixth Amendment Claim

Arthur's Sixth Amendment claim turns on the trial court's preclusion of a series of questions his counsel attempted to ask two detectives at trial. Essentially, counsel tried to ask both detectives whether they had ever searched Hart's car or home to locate the gun used to kill Levin. Arthur contends that this testimony was important to his theory of the case, which was

---

[7] In Lauro, the police officer "handcuffed Lauro and walked him out the front door and outside the station house. He then placed Lauro in an unmarked police car, drove around the block, removed Lauro from the car, and walked him back into the station house." Lauro, 219 F.3d at 204-05.

that the police had decided before thorough investigation that he "was the shooter and was more culpable than [Hunt]." According to Arthur, the testimony his counsel sought to elicit would have shown that the police's failure to search Hart's car or home "was negligent, which reflects adversely on the integrity of the entire investigation."  The trial court judge, relying on Chambers v. Mississippi, 410 U.S. 284 (1973), precluded the examination, because, inter alia, the examination was premised on speculation about what would have been found in Hart's home or car, Arthur had not established a good-faith basis for "cross-examination based on establishing a reason to fabricate," and fear of jury confusion.  The judge ruled that the prosecution was prohibited from arguing that the police did a thorough job in their investigation, and that the defense could argue that the police never found, much less looked for, a murder weapon.

On direct appeal, the Appellate Division considered and rejected precisely the argument Arthur now makes on habeas.  The court ruled,

> The trial court properly exercised its discretion in limiting the cross-examination of the police officers as to whether they searched the codefendant's car and home, or applied for warrants to do so.  Such searches, had they been conducted, would not have resulted in any exculpatory evidence since even if the police had recovered the murder weapon in the condefendant's possession after the shooting, this would not have been inconsistent with defendant's

15

> guilt. Moreover, the proffered cross-examination
> would have invited speculation as to whether the
> search would have produced something productive, and
> would also have delved into the legal requirements for
> the issuance of search warrants and the officers'
> knowledge thereof, which had the potential to confuse
> or mislead the jury.

People v. Arthur, 738 N.Y.S.2d at 15.

The Report reached the same conclusion, finding that the trial court appropriately discerned "the proper balance between Petitioner's right to ask questions he believed might help him and the court's legitimate interest in focusing the case for the jury." Further, the Report found that any error in the trial court's evidentiary ruling was harmless because the evidence of Arthur's guilt was overwhelming and thus there was no possibility that the trial court's preclusion of the testimony engendered "a reasonable doubt that did not otherwise exist." United States v. Agurs, 427 U.S. 97, 112 (1976).

None of Arthur's objections is relevant to the Report's analysis of this claim. In discussing this claim, the Report nowhere suggests that its analysis hinges on Arthur's failure to cite germane Supreme Court precedent. Nor does Arthur cite in connection with this claim a Second Circuit case that the Report arguably should have considered. Having found no facial error in the Report's treatment of Arthur's Sixth Amendment claim, the claim is dismissed.

16

CONCLUSION

Having reviewed the Report with care, there is no error in its conclusions. For the reasons given in this Opinion, Arthur's objections to the Report are denied following a de novo review of his claims. Arthurs's petition is denied. No certificate of appealability shall issue. Arthur has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005). Moreover, any appeal from this order would not be taken in good faith. See 28 U.S.C. § 1915(a)(3); Coppedge v. United States, 369 U.S. 438, 445 (1962). The Clerk of Court shall dismiss the petition.

SO ORDERED:

Dated: New York, New York
February 21, 2008

_____
DENISE COTE
United States District Judge

Copies sent to:

Corey Arthur  
No. 98-A-7146  
Attica Correctional Facility  
P.O. Box 149  
Attica, New York 14011-0149

Sandra E. Cavazos  
Assistant District Attorney  
One Hogan Place  
New York, New York 10013